Good morning, Honors. Timothy Coates on behalf of Appellant Unicon. This case is fairly straightforward. Appeal from a grant of summary judgment. The issues are relatively narrow. The question is whether the District Court properly grants summary judgment on Unicon's claims, breach of contract claim, based on the fact that Unicon purportedly could not show the fact of damage. The Court focused on software users after March 2002. And according to the Court, Unicon didn't present any evidence that there were such subscribers. Mike, maybe you should start, help me understand your claim. Sure. What was your claim for that part of your breach of contract claim? You have to establish damages, obviously. Yes. So what was the basis for that part of your call to action? Basically, this is rather like a licensing agreement. Unicon has intellectual property on evaluating risk-based capital. It enters into agreement with Intercept's predecessor to allow them to use that intellectual property to create software that financial institutions use. And that's the licensing portion of the agreement. There's also an updating portion that if Unicon became aware of a major change in regulations, they'd let Intercept know so Intercept could change the software. Based on that, Intercept made at least two versions of the software during the contract term, Risk Reporter 1, Risk Reporter 2. And what the agreement said was that Intercept would owe Unicon a royalty on any financial institutions that purchased and subscribed to the software. And that would extend even once the contract expired, that you would continue. The second part, though, and that's what we call the right for Unicon to retain its intellectual property, it said Unicon retains its rights to this intellectual property even beyond expiration of the contract term. And this keeps, in Unicon's view, Intercept from continuing to use Unicon's intellectual property to make, for example, new versions of Risk Reporter, even after expiration of the contract. So the damages claim is that they continue to have subscribers for Risk Reporter 2 after March 2002. Now, remember, Intercept basically terminates the agreement, sends a letter of termination, and then it says, we're terminating this because you breached the contract. You didn't notify us of a federal regulation. That's the ground they gave for not paying royalties. And that was the specific grounds of this letter. The letter is dated August 2002. When they move for summary judgment, their position on summary judgment is, well, you know what, after March 2002, there really weren't any further subscribers for our Risk Reporter 2 software. So you can't show damages. You can't show that there's subscribers after that date. And I think our point is that we have at least three communications or two communications from Intercept and deposition testimony, and they all stem from the same source, which is Intercept's, you know, vice president, the guy in charge of royalties. And each of them, we think, creates an inference that there continue to be royalty subscribers after March 2002. So you had some discovery, right? Yes. You had all the power of subpoena. Yes. Request for production of documents and interrogatories. Yes. And were any documents produced showing that they had continued? Well, the documents that we discussed, the two letters from Intercept, from their president, in which he says, we're doing this because you've breached the contract. We're not paying royalties because you've breached the contract. It doesn't say a word about there being no subscribers. So did you do some discovery? There was discovery. We took his deposition, and I think that's one of the other key pieces of evidence. I mean, he's asking his deposition that, look, if we hadn't breached, purportedly breached by not telling you of this new federal regulation, would you have continued to pay royalties beyond March 2002? And he says, yeah, most likely. I mean, I think, I mean, our point is this is the point. Was there a follow-up question? Well, who would be? No. No. No. I mean, you know, without a doubt, I mean, the former trial counsel in the case, you know, he conceded in the district court that he wanted to reopen discovery to provide particularly foundation for one exhibit. That he offered to the court is supposedly showing these other financial institutions continuing beyond that date. But the court denied that request, and we have not made that part of the appeal. I think that was within the court's discretion. But I think our point is, could he have put on more evidence? Yeah, maybe. But the evidence that he had is at least sufficient enough to show the fact and inference that there are subscribers. We don't have to put on our full damages case at the summary judgment stage. And I think it's one of those where it's not the quantum of evidence, but the source of the evidence. I mean, this is the guy who's in charge of the royalties. And at his deposition, I mean, he's asked pretty specifically. I mean, look, if we hadn't breached, would you have continued to pay royalties? And he says, yeah, most likely. Now, if you don't have royalty subscribers, the answer to that question is no. When he sends the letter in August 2002 terminating the royalties, saying, look, we're not paying any more royalties. He says it's because of the purported breach of the contract. Now, if you don't have any subscribers after 2002, the easy answer is we don't have any more subscribers for this software. He might not have known at the second when he was testifying. Did he have to – are you charging him with all the knowledge that you want him – that he knew he needed to know? He would be the person most knowledgeable at Intercept about the royalty payments. I mean, he was the gentleman who oversaw them. He's the one – for example, one of the other things that we cite is I believe it's a May 2002 letter, and he's enclosing the royalty payments for January through March. I mean, he is the royalty guy. And that was generated in May. And according to them, they had no subscribers after March. And so you're wondering, well, here, too, he sends us a letter saying here's payment January through March, and he's doing this in May when he presumably at that point knows there are no more royalty subscribers. He doesn't say that either. I mean, I think it's the nature of the person who's making these statements that gets us past that scintilla of evidence standard that the district court, you know, applied here. And I think we cite a number of cases, you know, from this court that say, look, that kind of inferential evidence is enough, you know, at least at the summary judgment stage. And I think the court came in and said, well, you know, you have to be able to quantify your damages at this point. And that's not a correct statement of the law either. In fact, the case the district court ---- You may not have to show the exact amount. That's right. And I think, I mean ---- And I understand what she said was you may have this evidence here, but it's, you know, it didn't quite get over that threshold of ---- I mean, I think our point is that if the person who's in charge of royalties at Intercept is asked directly, if there weren't a breach, would you continue to pay? And he says, most likely. I mean, if there aren't subscribers, the answer isn't most likely. It's no. But I don't understand why during the course of discovery you just didn't ask them, who are your users? I don't understand it. No, I take the court's point. I mean, believe me, I take the court's point and ---- I have a list of all your users. Yeah, I take the court. It would certainly make it a much easier opposition to summary judgment. But I think the point is, could he have done more? Yeah. But did he do enough? We think that under the case law of this court about inferences and certainly at the summary judgment stage, yes. Because, I mean, this is Intercept's person in charge of royalties asked, would you have continued to pay but for this breach? And he says, yeah, most likely. I mean, if you don't have subscribers ---- Sometimes you can stop questioning because you think I'll give him the opportunity to give us the answer that we don't want to hear. That's true, too. That's true, too. The other side tries to flesh out at trial to get their side of the story out. I mean, that's the other aspect here. I mean, we have not one but I think three communications from this vice president of Intercept. And in every one of them, it's consistent with the fact that there are existing subscribers. And I think one of the cases the district court cited for that, the other part, you really need to kind of get some notion of quantifying your damages, and that's the Dolphin Tours case. That actually supports us because here the method of calculation isn't difficult. I mean, you know, you calculate the royalties from the number of subscribers. Most of the cases the district court cites tend to be antitrust type cases where the fact of damages may be a little difficult to show, you know, damage to the market. That's not this case. In fact, in the Dolphin Tours case, the court says, look, the amount of damages, putting numbers to this theory, this method of calculation is something that you can do at trial. And I think our point is that the method of calculation is pretty straightforward. You know, we can come in at trial and show the ledger and the other things and the jury can figure out what the amount of the royalty payments are. But I think we do have enough to at least go forward because we have the person at Intercept who's in charge of this and the only reason he ever gave for not paying royalties was he breached the agreement. Now, the second point, and I think it warrants reversal of summary judgment, is on the declaratory relief claim. And because that goes to Intercept's right to continue to use Unicon's intellectual property to make additional versions of Risk Reporter. Now, the motion for summary judgment focused on Risk Reporter 2, didn't focus on additional versions. Intercept has gone on to make Risk Reporter 3, Risk Reporter 4. According to Intercept, they think they have a right to this intellectual property. I mean, they argued that it was in the public domain. As we noted, under California law, that doesn't protect them, vis-a-vis us, because they've contracted with us with respect to license our intellectual property. They've agreed that it's ours by virtue of the contract. It restricts their right to use it. The district court focused, again, on Risk Reporter 2 and said, well, you didn't show damages on Risk Reporter 2. Therefore, you don't have any existing controversy. But this is an ongoing right of Unicon to keep its intellectual property. Yes, could I ask, is there anything in the record to support the notion that Intercept has exploited, used, misused the intellectual property of Unicon since the termination of the contract? I'll put it two ways, I think, Judge Conlon. The first would be, bear in mind that they didn't move for summary judgment on the absence of any use of 3 or 4. They moved on Risk Reporter 2. They were the ones tying it strictly to the royalty agreement. It came out, and we have deposition testimony from Ken Lemoine. This is the royalty guy again, and he talks about the fact that there has been a Risk Reporter 3 and a Risk Reporter 4. And in their documents, they claim that they have a right to this intellectual property. I mean, they say that the breach relieved them of that obligation. I mean, they say they have an ongoing right to use this. But is there any record evidence to suggest they have continued to use property of Unicon since the breach? Well, using Risk Reporter 3 and 4, that's in the deposition testimony of Lemoine. I mean, I think, let's see where it is. I think it's ER 42 where he refers to it, and I think in their reply in the motion, their reply to the summary judgment, which is CR 51, I think it's page 2, they have a reference to their rights to continue to do this. So, I mean, the position they took in the district court was there was a breach of contract, and so that wiped out our ability to enforce this period. But I want to emphasize again, when they moved for summary judgment, they were the ones that were pushing Risk Reporter 2. They didn't shift the burden to us with respect to future use of their intellectual property, which is why there's that fallback position that they say, well, you didn't really plead this. You only pleaded under your injunctive relief cause of action, under deck relief and injunctive relief. And that was the alternative basis that the district court used. But, you know, we would submit that under this Court's decision in Fontana v. Haskins, you know, that there's fair notice pleading of what our claim was. I mean, the injunctive relief claim incorporated the prior allegations on breach of contract. It refers to Unicorn's right to retain its intellectual property. It refers to Unicorn's fear that the property will be used in the future. That's all that's required for that aspect of the breach of contract claim, and that's all that's required for the declaratory relief claim. I mean, this is a case that really does need a declaration of rights. I mean, they claim that they have a right to continue to use this property. And I think under the declaratory relief standards, we would be entitled to go forward on that claim at the very least. And, again, the district court saying, well, it was pled under deck relief under the Fontana case doesn't really go anywhere. Because the court, remember, Fontana is the case where the plaintiff didn't plead a Section 1983 claim, but just kind of a sexual harassment claim by a police officer. Summary judgment was granted on the Section 83 claim, saying, well, it's not in your pleadings. And this Court reversed, saying, yeah, but the allegations are there. The fact that they're not under the specific cause of action doesn't matter. And I think that's really very much the situation here. The last point to address is, again, they moved for summary judgment also on the fact that we had breached the contract on the merits. The district court judge did find a genuine issue of fact on that. I think she's absolutely correct, certainly applying the summary judgment standards. Because the question was whether the federal regulation was a material change in the regulations that would have required us to notify that. The evidence was in conflict on that. One of Intercept's own employees said it was a minor change in programming code. The federal government itself didn't even send the new rule out to the banking industry for comment before enacting it, which they would typically do on something that was significant. And Intercept's president testified as to the lack of the substantial nature of that. And so I think the court was correct. And with that, I would reserve any further time for rebuttal unless the court has other questions. Okay. That's fine. Thank you. We've got plenty of rebuttal time. Good morning, Your Honors. Cress Templeton on behalf of Appley Intercept, Inc. What I'd like to do is sort of start with the end of where counsel left off, and that is with this contract exploitation idea and how it interrelates to the case as a whole. If you look at Appellant's brief, they make very clear that as long as Intercept continued to pay for what it was owed for the flow diagrams, which was the intellectual property that they provided, we had a right to continue using this. This whole case revolves around one issue. Did we pay what we owed, or did we not? It doesn't matter whether you call this a contract exploitation theory or a contract, some other contract. It's the same contract. So it makes no difference for any cause of action whether you call it another name. The real issue on each of the claims at issue here is whether or not Unicon put on any evidence that there were any damages, meaning any failure to pay for customers who initially purchased during either the 1986 agreement, excuse me, the 1990 agreement or the 1996 agreement or the interim. Those are the only customers and renewed on an annual basis. Those are the only customers at issue. We specifically put in our separate statement on the genuine issues that there are no such customers. There was no evidence to the contrary, and that's why Judge Morrow correctly granted, we believe, summary judgment on that issue. The evidence that Unicon wants to point to ‑‑ When you do your statement of genuine issues and you say there are no users that fall within those categories, you usually point to some evidence that supports that. Correct. So you pointed to a declaration by somebody saying there were no users that fall into that category? Yes. We specifically ‑‑ it was a declaration of Ken Lemoyne, and he went through that he reviewed all the financial records, all the applicable information available to him that he was responsible for paying the royalties and that there were no customers that fell within any of those categories. And they came back and they said, well, here's these three documents that you could draw an inference that there are. That's correct. That's what happened. Yes. And with respect to those three documents, in order for testimony or documents or anything else to have ‑‑ to provide an inference, it has to be more than speculative. And each of the documents and the testimony that they're relying on, it's really just speculative. And I think they really admit it in their briefs when you read what they relied on. For instance, let's take, for instance, the Transmittal of the Royalty Check in May 15, 2002, for the first quarter. They say basically that, look, Lemoyne didn't mention in there that there were no customers who hadn't continued to renew on an annual basis. And here's what they conclude the inference is from that. In the 45 days, and this is at their opening brief at page 26, in the 45 days between the end of the first quarter of 2002 and sending the letter of knitting payment, Intercept, quote, unquote, necessarily checked how current each of the royalty subscriber's accounts were in order to calculate its royalty payments to Unicom. That's a presumption. And there's no evidence in the record whatsoever to support that presumption. By definition, then, it's speculative and cannot create an inference of anything. It would be different if Unicom had been able to, say, point to royalty payments and Transmittal letters that Intercept had sent all along. And each time they said, okay, here's the amount we owe you, and plus, here are the customers who no longer subscribe on an annual basis that were within the scope of the contract. That would be different if suddenly, or we did it the other way. You might be able to draw some inference, but there's nothing in a royalty statement to draw any inference that even looked at whether there were any customers who fell within the terms of the royalty customers who should pay, that is, those who signed up during the relevant period and continued to subscribe on an annual basis thereafter. It's not just continue to subscribe. It's continue to subscribe on an annual basis under the agreement. And it's the same with the August 22 termination letter that they rely on. In their brief, at page 25, they say about that, by contrast, it is reasonable to, quote, unquote, assume that if Intercept no longer serviced customers that would trigger royalty payments under the agreement, it would simply have said so. An assumption is, by definition, speculation. So, again, on the August 22 letter, which is excerpt number 27, you just can't draw any inference one way or the other from the failure to say anything about royalties in that statement. I think what really points out that these kinds of silence can't really provide an inference are the cases that they rely on. They rely on, effectively, three cases, which is Bilikumsky, Enright Crystal Properties, and Leach v. City of San Marcos. And the common thread in each of those cases is that someone was either compelled by a specific rule or dire consequences to say something. And if they didn't in that situation, the court said it's reasonable to assume that what they didn't say, that is what they were required to say, was a fact. We don't have that here. We don't have anybody who was compelled by any law statute or anything else to say anything. Their argument is that, well, they necessarily faced a lawsuit. Well, that's not true. We don't know what we're facing. How would LeMoyne know what he was facing when he wrote that letter? If he received a demand letter saying, you breached and here's why you breached, maybe he should have said something. But that's not the situation. We're simply sending out a termination letter. There's no requirement for us to say anything different in that situation. The final piece of evidence that they rely on is Ken LeMoyne's testimony, the most likely testimony. Most likely would have is, by definition, speculative. What somebody would have done in a situation that hasn't happened is complete speculation. They didn't even lay a foundation for him before they asked that question, or at least they haven't put it in evidence. Did you look at the accounting records? Did you look at the royalty payments? Did you do this? Did you do that? There's no foundation that he had any knowledge whatsoever that there were any royalty customers for which there would have been money owing. So it, by definition, is complete speculation to ask him for him to conclude from that, that there had to be royalty customers for whom we should have paid. Mr. Templeton, what would be the bottom line of the decision of this Court, in your view, on this record as it is now before us? The bottom line would be I'd ask the Court to affirm the summary judgment. I know, but we'd have to affirm the summary judgment for the reason that what? I would ask that you affirm the summary judgment for the following reasons. One, that there was no evidence of damages. There was no evidence that created a reasonable tribal issue of fact. If there was, it was at most a scintilla, and there was no colorable claim that it proved the fact and could never have gotten to a jury. Even if there were such facts sufficient to create a tribal issue, they still didn't have enough evidence for the method and the calculation of damages. What the cases say is you have to be able to show the amount on summary judgment. You have to give enough so a reasonable jury could come to some amount. They didn't do that. What they argue is we have the calculation. They don't have the data, though. The method, excuse me. They have the method, but they don't have the data. Without the data, that is without what the numbers are, there's no way a reasonable jury could calculate damages in this case. And the case they cite, the Dolphin Tours case, that was an antitrust case. In that case, there was data provided. In that case, it was an antitrust. You're shaking your head. I assume you know the case. No, no. Okay. In that case, it was an antitrust case, and the plaintiff put on evidence of how much in damages, the amount of damages it would suffer in a competition, in a competitive environment. What the court below said was, well, you didn't put on evidence of what would have happened if there had been any barriers to entry in this antitrust case. The court of appeals reversed saying, look, they didn't have to put on that evidence. That's something that they could have filled in at trial if the other side raised it. But what the court had in front of it and what the plaintiff put on was sufficient data and a method of calculating the damages so a jury could have come to some amount. Again, here, we don't have that, and it's not even close. The final thing I would ask, following up on your question, Judge, is that what I would ask for also is that the court also affirm on the grounds that the other side failed to notify us of a change which might affect the operation and or functionality of the software. And here's why I'd ask that. How could we on summary judgment when the court has indicated it thinks it's factual? Because I think the court misunderstood a key fact when it made that determination. What the court concluded is that there was evidence that the failure to notify us did affect the operation and or functionality. But on the other side of that, there was also evidence that the changes in the regulations were not that material. My point is that's the wrong evidence that needed to be put in to overcome the prima facie case that we put on. Unicon would have had to put on evidence that under no circumstances could the changes in regulations have affected the operation or the functionality of the software product. They don't have any of that evidence. There was none pointed to in the record. So I think that what the judge looked at was just the wrong evidence on that and got off base. There was full discovery in this case as far as we can tell from this record. Was there? Yes. You can tell from the docket sheet, Your Honor, that we were set for our final pretrial conference immediately following summary judgment motion if that was denied. If there's anything else, I'd be pleased to address it. Does it matter to us that that was full discovery and you didn't find that the reader you're looking for? Well, if as we contend that these three items of evidence, the two letters in the  testimony show the fact of damage, if we didn't produce other evidence, it doesn't matter. If that's sufficient to create an issue of fact, could they have done a better job? Yes. Ultimately, you have to show the amount of your damage. I don't believe we have to show it at summary judgment. I don't think there's any case talking about quantification summary judgment. You're certainly right. You ultimately have to be able to show the jury what the amount of your damage is sustained by this breach of contract. That's right. But there are no cases. The district court cited or the other side has cited talk about numbers in that. They are all formula and method cases. And I think that's really what the distinction is here. That's why the Dolphin Tours case is worth looking at because it talks about there you have to have a method of calculation. And this is a case where the method of calculation isn't tricky. Okay? Mr. Coates, the slim read you're relying on. Some kid says, Mother, may I go out to play? She says, No, it's your dinner time. And that's the reason she gives. Then later on she says something else. She was asking a question. She gave an answer. That doesn't mean that's the only answer. Well, no. But that's generally enough evidence that goes to a jury. I mean, most cross-examinations look exactly like what we're talking about here. You compare their brief and our brief talking about what inferences you draw from the letters. Sure. But if this record had asked the next question, it would be resolved. And we have to we don't want to assume anything. But one of the inferences from the failure to ask the question was because the person asking questions didn't want the answer. That's right. But inferences are drawn by juries, not by courts. And I think that's the point that we make here. We aren't finding facts. The only thing we're doing is a matter of law. Was the court correct on this record in granting summary judgment? Absolutely correct. But I'm saying, again, I think that the defense posture here is saying that, well, circumstantial evidence is speculation. And the case law utterly repudiates that. And that's why I think the cases that we cited are directly on point. I mean, for him to say, oh, we weren't worried about a lawsuit when we're saying we're terminating because you breached the contract, I mean, that absolutely puts them in jeopardy. So I submit that under the cases that we cite, this is exactly the type of inferential evidence that lets you go to the jury. And I have to go to one point. Particularly on declaratory relief, the response that they've made is, again, talking about Risk Reporter 2. Those were the subscriptions that occurred during the agreement. They're ignoring the other part of the licensing agreement, which is our continued right to this intellectual property that prohibits them from using it in the future. It doesn't talk about Risk Reporter 3 and Risk Reporter 4. They didn't move on Risk Reporter 3 or Risk Reporter 4. They didn't talk about their future rights. They didn't attempt to negate this claim. And I think that's why he immediately goes back and says, oh, you have to look at what the subscriptions are under the agreement. We're not talking about those. This is their use of our intellectual property to get new subscribers later or to get old subscribers with new technology that's based on our intellectual property. And that claim has not been addressed by them. It was an appropriate claim for declaratory relief. I think there's an actual controversy on that. That would be another ground to deny the summary judgment motion. If the court has no further questions, thank you very much. I appreciate it. Thank you. I appreciate your arguments. The matter will be submitted. I'm going to need a break. Yes, good. The court will take a 10-minute recess before calling the next two cases. All rise. This court shall stand in recess for 10 minutes. This court shall stand in recess for 10 minutes. I'm going to try. My turn. I'll let you. I don't have these tomorrow. Do you? Yeah. Which one? The case with Linda and the lost apes. What was the carrier report? That was Andrew. Okay. That will probably change here. That's right. Go back to the break. How do you like your new firm? I like it a lot. Lots of work. People are really nice. Good to work with. Do you guys have to move? Are you still in the same place? Those guys did in the L.A. office, they had to move. Yeah, that's right. I didn't have to move. Basically, all I had to do was scrape the name off the door and paste it on. But even in L.A., it was only a half a block away. Okay. Close this one out there. Yeah. Okay. Okay. Okay. Okay. Okay.  Okay. Okay.  Okay. Thank you. Yeah. Yeah. Yeah. Talk. Has the lead moved out yet to the new office? They're doing that this weekend. It's a real shame. Have you seen the getup he has over at the current office? Yeah. Real nice setup, isn't it? Yeah. It's got a private home. Yeah, I know. It's just a shame. It's a nice, you know, with everything you need and sort of, you know, it's not office-y like. You know, it's just a real shame that they're making a move. Yeah. But, you know. There's only people. That move was a little fun. You guys planning to do a little bit of work with your former partner? Yeah. He said that Bob went with Corinne to Conceica. To do some depos. Yeah, I guess. I don't know if that's where. Carlini and I. Conceica's out back over there. Bob sent me an announcement just this past week. I got it. It's the law offices of Robert King. Maybe I should send out my announcement, huh? Did you do that already? No, I don't think I did. Are we kind of late? Probably, yeah. Probably the statute of limitations has run out by now, I think. Let's go to Chum for office gifts or something. Pardon? Let's go to Chum for office gifts. You know, I've already got, like, you know. It's much, you know. Snow globes, calendars. You know, it's about a kind of gumball machine. You know, little plaques and things. You know, and stuff. Yeah, I need to get rid of some of that stuff. I got more. We all own too much stuff. I agree. So Lisa's going to do a page. You know, I just parachuted into that case. And, you know, parachuted right back out. That position was over. So I really have no idea what's going on. Did you look at the case? Yeah, Tom. Lisa? Yeah. Lisa just filed a brief. And mine's due. Just filed a motion for extension in January. Did the judge have no insight on some of your judgment? Or did he? No, it was a trauma. I'd like to know how you learned how to parachute out of a case. Every time I touch a bottle, it sticks to me. Well, normally, the ones that really stick to me are the real bad ones. This might be an exception here. It's not just a terrible case. When I was working with Lisa, I was hoping the guy who handled sort of the comebacks of the real bad cases would be one. We got an RV Dishman on the field. And then eventually we got a cell case and a mobile case on the trip. You know, the history of that thing. Well, then we got murdered at a trial. And the guy got dragged into sort of, you know, the field in the second half of that. There's two cases. I was always the guy. Leslie's where is she in West Covington? You know, I don't know where she went. I don't know. Oh, I've heard of that. I was at her movie. She must still be in school. That's exciting to quote her. Oh, good for her. Yeah, I mean, that's just such a nice job. One of the few, you know, you always get these things to review. Terry's, you know, her upper trenches. You know, I got one for her. This is one of the few people that I know that can send these things. Yeah, well, most of the time I don't. I don't send them. I've been with her. Oh, yeah. Yeah, I do, yeah. She'll be great. I actually get a lot of them because of the natural progression of, you know, the government, the public defenders. You take the next step, and you're, you know, you might be a state court judge. Hopefully, I'll take a step out of that. Okay. Now, there's two judges in the House. Our other judge. Yes, sir. That's great. It's funny. The guy who handed in Rogan was Jim Rogan. He was a good Congressman. He also had done Terry Regan's. I was thinking I was doing the wrong green. The problem with those guys is that it takes a while. Yeah. I know. Well, when I was coming out of school, a lot of the kids in the DA's office were facing to have less than plum assignments. They were the ones that worked through it. Yeah. So, one time, I graduated with starched rind burgers, probably six or seven years old. Okay. Okay. Okay. Okay. Okay. Okay. Okay.  Okay. All rise. This court shall resume session.
judges: Farris, Paez, Conlon